**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

LINDA C. SAYLOR                                                                                          PLAINTIFF

v.                                                  No. 4:05CV138 JLH

RETIREMENT COMMITTEE, as Plan Administrator for
UNIVERSAL HEALTH SERVICES, INC.; and
UNIVERSAL HEALTH SERVICES, INC.                                                    DEFENDANTS

**OPINION AND ORDER**

Linda Saylor brought this action against Universal Health Services and its Retirement Committee (collectively "UHS"), alleging violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").  UHS has filed a motion for summary judgment. For the following reasons, this motion is granted.

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis of its motion and identifying the portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 763 (8th Cir. 2003).  When the moving party has carried its burden under Rule 56(c), the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v.*

*Zenith Radio*, 475 U.S. 574, 587 (1985) (quoting FED. R. CIV. P. 56(c)).  The non-moving party sustains this burden by showing that "there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.  When a non-moving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.  In deciding a motion for summary judgment, the Court must view the facts and inferences in the light most favorable to the party opposing summary judgment.  *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 841 (8th Cir. 2001).  If the evidence would allow a reasonable jury to return a verdict for the non-moving party, summary judgment should be denied.  *Derickson v. Fid. Life Assoc.*, 77 F.3d 263, 264 (8th Cir. 1996).

## I.

Linda Saylor was employed as the director of medical records at the Bridgeway Hospital in North Little Rock, Arkansas.  During her employment there, Saylor participated in a retirement savings plan administered by UHS.  The Plan qualified as a tax-deferred plan under § 401(k) of the Internal Revenue Code.  Fidelity Management Trust Company serves as the Plan Trustee and handles the day-to-day transactions for plan participants' 401(k) accounts.[1]

---

[1] Saylor denies that Fidelity serves as the Plan Trustee and handles participants' account transactions.  The defendant has produced evidence to support these statements of fact, however, and Saylor has produced no evidence to the contrary.  The party resisting a motion for summary judgment may not "rest on mere allegations or denials," but must produce evidence showing the existence of a genuine issue of material fact.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (citing FED. R. CIV. P. 56(e)).

**A.      The Plan**

The summary plan description informs participants:

**When Benefits are Payable**
Your vested account balance in the Plan is payable upon:
•       Normal Retirement
•       Early Retirement
•       Deferred Retirement
•       Disability Retirement
•       Termination of Employment
•       Death

Unless you select a later date, if you are entitled to a Plan distribution, your account will be valued as of the day before the distribution is made.  Your account balance will be paid as soon as administratively practicable.

Another section of the summary plan description, however, provides:

**If You Need to Withdraw Money**
Although the main objective of the Plan is to provide retirement income, unexpected situations may arise before retirement which may cause you to need your savings sooner.  Therefore, you can withdraw money from your vested account under certain circumstances as described below.  However, your withdrawal is subject to applicable Federal restrictions and/or penalties.

You cannot repay withdrawals from your vested account.  The Plan permits two withdrawals per year.

Withdrawals will normally be paid within 5 business days following approval.
\* \* \*
**Age 59 ½ Withdrawal**
After age 59 ½, you may elect to withdraw your total vested account balance and investment earnings for any reason.  The minimum withdrawal is $250.
\* \* \*
**Rollovers to Another Eligible Retirement Plan or an IRA**
If you leave you may avoid immediate taxation on your distribution if you directly deposit it into another eligible retirement plan of your new employer or an IRA.  The Plan trustee will make this direct deposit of your account upon request from you.

The Plan, like the summary plan description, provides for "distributions" upon retirement, disability, or death of the participant, as well as "withdrawals" for various reasons.  Article VI,

3

"DISTRIBUTION," explains the conditions under which a participant may receive a distribution of her account upon retirement. In a subsection entitled "Timing of Distribution", Article VI provides:

> Unless the Participant otherwise elects, the participant entitled under this Article to receive benefits shall begin to receive benefits as soon as administratively practicable, but in no event later than the 60th day after the close of the Plan Year in which occurs the later of (1) the Participant's reaching age 65 or (2) the Participant's termination of employment with the [employer].

Article IX, "WITHDRAWALS," states that "the interest of each Participant in the Fund may be withdrawn upon reasonable notice prior to the time determined under Article VI in the manner, in the amount, and at the time provided in this Article." A subsection entitled "Withdrawals After Age 59-1/2" provides that "following a Participant's attainment of age 59-1/2, he or she may withdraw, without penalty, up to the total value of his or her vested [account] by submitting his or her written request to the Administrator."

**B.**   **Saylor's Retirement and Account Rollover**

Saylor began to contemplate retirement in February 2004. According to Saylor, she called Susan Kennedy in the UHS Benefits Office sometime that month, and Kennedy told her to contact Fidelity. Saylor talked to Richard Robichaud at Fidelity. He sent her the Fidelity Rollover IRA Application.

The first page of the Fidelity Rollover IRA Application establishes two steps to complete the process. In step A, the participant establishes her Fidelity Rollover IRA by completing the application. In step B, the participant must roll over her eligible retirement assets to Fidelity. The instructions direct participants to "[i]nitiate your plan's distribution(s) by calling your plan's toll-free number. Request and complete any required distribution forms and follow the appropriate

processing instructions." The instructions also tell the employee that she "must also initiate your plan distribution by calling your plan's toll free number."

Saylor completed the application in April 2004, and Robichaud received it the following month. Saylor's IRA was assigned to Andre Young, an account representative with Fidelity. Young had no role in managing Saylor's 401(k) account.

Saylor retired from Bridgeway on June 4, 2004, at the age of 60, but remained a "per diem" employee, which meant that she would work on an as-needed basis. Saylor alleges that on June 9, Young informed her that her 401(k) account had not yet been rolled over into her IRA. Saylor testified that she told Young that the 401(k) account should not yet be rolled over because she had not yet received her final paycheck from Bridgeway, and part of the money from that paycheck would be distributed to her 401(k) account.

Because Saylor assumed that her 401(k) would be automatically rolled over into her new IRA, despite explicit instructions to the contrary on the IRA Rollover Application and the instruction sheet, she took no actions to direct a rollover between June 9, 2004, and July 21, 2004. Saylor alleges that Young called on July 21 and left her a message indicating that UHS had not released her 401(k) account.

Saylor then called Kennedy, who told Saylor that she was not eligible for a "retirement distribution" because she remained employed on a per diem basis with Bridgeway. Saylor testified in her deposition that she then told Kennedy, "It doesn't have anything to do with that. It has to do with how old I am." When asked if she said anything else to Kennedy about it, Saylor testified "I don't know. I was getting pretty hot by that time, so I don't think I said much of anything else. I know I hung up."

Saylor testified that she then called Peggy Dunn, an employee in Bridgeway's Human Resources department, who also stated that Saylor must be separated from employment with Bridgeway. Saylor admits that she did not tell Dunn during that conversation that she sought distribution of her funds under the "age 59 ½" plan provision. During her deposition, Saylor was asked: "Did you say to Ms. Kennedy or Ms. Dunn, either one, that I want a 59 and a half distribution, or anything to that effect?" Saylor answered:

> Well, I mean I said it had to do with my age, which, I mean, they have my age in there. I mean, I was 60 when I retired. And they -- and she had my -- they already had my paperwork that I was trying to, you know, roll it over. I mean, I don't know how much more plain you can be.

Saylor wrote a letter of resignation on July 21, 2004, stating that she was terminating her per diem status because she wanted her 401(k) account rolled over. Saylor mailed this letter to Dunn.

Between July 21 and August 23, 2004, Saylor did not direct Fidelity to effect an age 59 ½ withdrawal from her 401(k) account. Saylor contacted Fidelity on August 23 and requested an age 59 ½ withdrawal. The following day, August 24, 2004, Saylor's 401(k) account was rolled over into her IRA.

**C.    Saylor's Claim**

Saylor contends that UHS improperly delayed the rollover of her 401(k) account into her IRA and that her account diminished in value in the amount of $4,753.00 during the delay. In November 2004, Saylor wrote a letter to UHS appealing her alleged loss. UHS denied Saylor's appeal.

Nancy Kurtzman, UHS's Director of Employee Benefits, explained this decision in a letter to Saylor. Kurtzman stated that UHS's records showed that Saylor had requested a benefit distribution based on "separation from employment," i.e., Saylor's retirement on June 4. Kurtzman

6

stated that UHS attempted to fulfill Saylor's request, but was unable to do so because "the Internal Revenue Code does not consider per diem status as a separation from employment." According to UHS's records, Saylor did not request a withdrawal of her account funds based on the plan's age 59 ½ provision until August 23, 2004, at which time the request "was promptly processed." Kurtzman acknowledged that Saylor had "incurred investment losses" while "trying to resolve a termination distribution," but determined that UHS was not responsible for those losses under the circumstances. Kurtzman also pointed out that Saylor had been free to request the age 59 ½ withdrawal earlier or to change her investment options to limit her investment risks during the time period in question.

Saylor's claim for benefits in the amount of $4,753.00 apparently represents the approximate difference in the value of her account from June 30 to August 24, 2004. Saylor's complaint is unclear on this point. According to Saylor's account statements, submitted as evidence by UHS, the value of her account was $119,258.49 on June 30, 2004, and $114,523.05 on August 24, 2004. The actual difference in these amounts is $4,735.44.

Saylor testified in her deposition that Kennedy had told her that the account would be released "approximately 30 days" after Saylor completed the "rollover paperwork." Thus, Saylor testified, she expected that after she retired on June 4 UHS "should have rolled my account over either the 29th or 30th, because they had plenty of time to do it." When asked why she picked the dates of June 29 or 30, Saylor replied, "Well, because it was approximately 30 days post my retirement." Saylor admits, however, that the first business day 30 days after her retirement was July 6, 2004, and that the value of her 401(k) account on that day was $117,232.46. Saylor's account statements show that the value of her 401(k) was at its highest on June 30.

Saylor selected the mutual funds purchased with her 401(k) contributions and could have changed the investments held in her 401(k) account at any time. Her options included selling all of the shares of her mutual funds and placing the proceeds in a fully insured money market fund. Saylor did not do this, even though she knew that the value of her investments could rise or fall on any given day.

## II.

Saylor asserts two claims against UHS in her amended complaint. In Count I, Saylor alleges that UHS "misled Plaintiff about her rights under ERISA." The Court interprets Count I as a claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3). In Count II, Saylor asserts that she "brings this action to recover benefits under ERISA," as she was "denied her vested retirement benefits in a timely manner." The Court interprets Count II as a claim for retirement benefits under 29 U.S.C. § 1132(a)(1)(B).

UHS points out that a plaintiff cannot maintain a breach of fiduciary claim under ERISA where the claim seeks the same remedy for wrongful denial of benefits. ERISA provides in pertinent part:

> A civil action may be brought--
>    (1) by a participant or beneficiary--
>                     \* \* \*
>       (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
>                     \* \* \*
>    (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

29 U.S.C. § 1132(a). The Eighth Circuit has held that individual plan beneficiaries have a right of action under § 1132(a)(3) for breach of fiduciary duty, *Howe v. Varity Corp.*, 36 F.3d 746, 748 (8th Cir. 1994), but cannot maintain this cause of action when adequate relief is afforded by the right to bring a claim for benefits under § 1132(a)(1)(B), *Wald v. Southwestern Bell Corp. Customcare Med. Plan*, 83 F.3d 1002, 1006 (8th Cir. 1996).

Saylor concedes that she cannot maintain both claims, but asserts that she presents the two claims as alternatives because "it is not clear how the Eighth Circuit would characterize" her claim. The Court need not determine this issue, however, because Saylor's claim fails whether analyzed as a claim for breach of fiduciary duty or a claim for benefits.

**A.     Claim for Benefits Under 29 U.S.C. § 1132(a)(1)(B)**

Saylor asserts that under the terms of the Plan, UHS was required to roll her 401(k) account over into her IRA on as of June 30, 2004, and seeks the approximate difference in the value of her account between June 30 and August 24, the date the rollover actually occurred.

"ERISA provides a plan beneficiary with the right to judicial review of a benefits determination." *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998) (citing 29 U.S.C. § 1132(a)(1)(B)). Although ERISA contains no standard of review, the Supreme Court has held that a reviewing court should apply a *de novo* standard of review unless the "plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80  (1989). Where a plan gives the administrator such discretion, the administrator's

decision is reviewed for an abuse of discretion.[2]  *Woo*, 144 F.3d at 1160 (citing *Firestone*, 489 U.S. at 115).

Under the abuse-of-discretion standard, the proper inquiry is whether UHS's decision was reasonable, that is, whether it was supported by substantial evidence.  *Ortlieb v. United HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004).  "Substantial evidence is 'more than a scintilla but less than a preponderance.'"  *Smith v. Unum Life Ins. Co. of Am.*, 305 F.3d 789, 794 (8th Cir. 2002) (quoting *Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944, 949 (8th Cir. 2000)).  "'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)).  An administrator's decision is reasonable if a reasonable person could have reached a similar decision, given the evidence in the record, not whether the reasonable person would have reached that decision.  *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002).

Saylor first denies that UHS's decision to deny her appeal is entitled to this deferential standard of review, arguing that the Plan contains "no language that explicitly grants discretion." This argument has no merit.  The Plan provides that the Plan Administrator has the duty and power "[t]o interpret the provisions of the Plan and to resolve questions or disputes relating to eligibility for benefits or the amount of benefits under the Plan."  The Eighth Circuit has held that plans with similar language granted plan administrators discretionary authority and that the abuse of discretion

---

[2] A plaintiff may obtain a less deferential review by demonstrating "that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her."  *Woo*, 144 F.3d at 1160.  Saylor does not allege that a conflict of interest or a serious procedural irregularity occurred that would entitle her to the less deferential standard of review set forth in *Woo*.

standard of review therefore applied  *See, e.g.*, *Birdsell v. United Parcel Serv. of Am., Inc.*, 94 F.3d 1130, 1133 n.2 (8th Cir. 1996) (UPS's discretionary authority was "apparent" where the Summary Plan Description provided that "United Parcel Service shall have the exclusive right and discretion to interpret the terms and conditions of the plan, and to decide all matter arising in its administration and operation, including questions pertaining to eligibility for, and the amount of benefits to be paid by the plan"); *Kennedy v. Georgia-Pacific Corp.*, 31 F.3d 606, 609 (8th Cir. 1994) (plan administrator was given both administrative and interpretive discretion where plan stated  that the plan administrator "shall be solely responsible for the administration and interpretation of this Plan").

Saylor then points out that the Plan provides that a participant may withdraw vested funds for any reason after reaching the age of 59 ½ by submitting a written request to the Plan Administrator.  Saylor contends that she submitted this written request several weeks before her retirement.  The only evidence in the record that Saylor submitted any type of written request regarding her account is the Fidelity Rollover IRA Application that Saylor filled out in April 2004. This application was sent to Fidelity, not to the Plan Administrator, however, and it does not state that Saylor sought to withdraw her funds pursuant to the "age 59 ½" provision.  Saylor has presented no evidence that she requested a withdrawal of her funds based on this provision prior to July 21, 2004, and even then Saylor told Kennedy only that the rollover didn't have anything to do with her employment status, "[i]t has to do with how old I am."

Kurtzman's letter to Saylor makes clear that until August 23, 2004, UHS believed that Saylor sought a distribution of her account based on her retirement from Bridgeway and attempted to

process the request. UHS was unable to process that type of distribution, however, because Saylor remained employed on a per diem basis.

The evidence in the record shows UHS's belief in this regard to be reasonable. Saylor testified that she sought to roll her account over in connection with her retirement. Moreover, in her appeal letter to UHS, Saylor stated:

> Before my retirement in June, I called the UHS Corporate Benefits Office in February, 2004, and was told it would take approximately 30 days to roll over my account and that I would need to contact Fidelity to fill out the paperwork. I did fill out the paperwork several weeks before my retirement date of 6/04/2004. . . .
> \* \* \*
> I think UHS should recompense [my] losses, as I did everything I could to have my retirement go smoothly and feel that it was incompetence and lack of response from my Benefits Office that caused this situation."

Saylor argues that "there is no plan requirement that Plaintiff explicitly invoke any provision of the Plan." Even assuming that this assertion is correct, it does not aid Saylor's position. The issue is not whether the Plan is so explicitly detailed that every possible contingency is addressed, but whether the Plan Administrator's interpretation of the Plan in deciding Saylor's claim for benefits was reasonable. Based on the undisputed evidence, it was reasonable for UHS to believe that Saylor was requesting a distribution based on retirement or "separation from employment." Given her per diem employment status at the time, the Plan did not allow for such a distribution. Under these circumstances, UHS's determination that it was not obligated under the terms of the plan to repay Saylor's alleged losses was not unreasonable.

Moreover, UHS processed Saylor's rollover within the time allowed under the terms of the plan. The Plan does not provide an exact date on which benefits will be paid following a participant's request. Article VI, DISTRIBUTION, states that a participant entitled to receive

benefits "shall begin to receive benefits as soon as administratively practicable, but in no event later than the 60th day after the close of the Plan Year in which occurs the later of (1) the Participant's reaching age 65 or (2) the Participant's termination of employment." Article IX, WITHDRAWALS, provides: "As soon as practicable following the Administrator's receipt of a Participant's election to make a withdrawal from his or her Account, . . . it shall direct the Trustee to pay the amount withdrawn to the Participant in a single sum."

Saylor points out that the summary plan description provides that "[w]ithdrawals will normally be paid within 5 business days following approval." Saylor argues that the summary plan description therefore conflicts with the Plan and cites *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 952 (8th Cir. 1994), for the proposition that "an SPD provision prevails if it conflicts with a provision of a plan." The language of the summary plan description, however, does not conflict with the Plan. A statement that withdrawals are "normally" paid within 5 business days does not require payment within that time period and is not inconsistent with Plan's statements that benefits will be paid "as soon as practicable" or "as soon as administratively practicable."

Finally, Saylor argues that her claims were not paid "as soon as administratively practicable." According to Saylor, this is evidenced by the fact that her account was not rolled over between June 4 and August 23, but when UHS received a specific request for withdrawal pursuant to the "age 59 ½" provision, UHS was able to roll Saylor's account over in one day. Although Saylor's argument on this point is not clear, she apparently contends that UHS's ability to effect her rollover in one day shows that UHS had the ability to roll the account over shortly after her June 4 retirement but did not do so. As discussed above, UHS attempted to roll the account over before August 23, but was unable to effect the rollover as a retirement distribution because Saylor was still employed

13

on a per diem basis. It was not "administratively practicable" for UHS to distribute Saylor's account on the basis of her "retirement" at that point. UHS does not contend that it could not have processed an "age 59 ½" withdrawal of Saylor's account before August 23, it contends that Saylor did not request such a withdrawal before that date.

In light of the undisputed facts of this case and the terms of the Plan, UHS acted reasonably both in its processing of Saylor's requests to roll her account over into her IRA and in its determination that Saylor is not entitled to payment for any decrease in the value of her account under the terms of the Plan. UHS is entitled to summary judgment as to this issue.

**B.      Claim for Benefits Under 29 U.S.C. § 1132(a)(3)**

In her "Brief in Support of Response to Defendant's Motion to [sic] Summary Judgment," Saylor asserts that UHS "breached its fiduciary duties imposed by 29 U.S.C. §§ 1104(a)(1)(A) and (B)[3] by failing to pay benefits within a reasonable time, as well as by misinforming her about the plan provisions." As discussed above, UHS did not fail to pay Saylor's benefits within a reasonable time under the terms of the Plan. The Court therefore addresses only the issue of whether UHS is entitled to judgment as a matter of law that it did not breach its fiduciary duty of loyalty to Saylor by "misinforming her about the plan provisions."

---

[3] Twenty-nine U.S.C. § 1104(a)(1) provides in pertinent part:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and --
   (A) for the exclusive purpose of:
      (i) providing benefits to participants and their beneficiaries; and
      (ii) defraying reasonable expenses of administering the plan;
   (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

Saylor appears to base her claim for breach of fiduciary duty on two allegations. First, Saylor alleges that UHS misrepresented the terms of the Plan by telling her that her 401(k) account would be rolled over into her IRA "about 30 days" after her retirement and by advising her that she could not roll her account over unless she terminated her employment with Bridgeway. Second, Saylor alleges that UHS "fail[ed] to provide crucial information" to her.

"The duty of loyalty embodies the 'obligation to deal fairly and honestly with all plan members.'" *Christensen v. The Qwest Pension Plan*, 462 F.3d 913, 917 (8th Cir. 2006) (quoting *Shea v. Esensten*, 107 F.3d 625, 628 (8th Cir. 1997)). This duty is breached when an ERISA plan administrator "participates 'knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense.'" *Id.* (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 506, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996)). A mistake in the administration of an ERISA plan, however, "is not a violation of the duty of loyalty absent evidence that plan administrators acted in the interests of someone other than participants and beneficiaries." *Id.* at 917-18.

In addition to the duty not to intentionally mislead plan participants, ERISA fiduciaries sometimes have an affirmative duty to disclose information. *Anderson v. Resolution Trust Corp.*, 66 F.3d 956, 960 (8th Cir. 1995). For example, a plan administrator cannot remain silent if it knows or should know that a participant is "laboring under a material misunderstanding of plan benefits" and that silence may be harmful to the participant. *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007). A plan administrator does not have a duty to individually notify participants of the impact of general terms of the plan upon them, however, as a fiduciary cannot be

expected to anticipate the individualized concerns of employees. *Maxa v. John Alden Life Ins. Co.*, 972 F.2d 980, 985-86 (8th Cir. 1992).

Saylor testified in her deposition that Susan Kennedy stated that Saylor's account would be rolled over about 30 days after her retirement and later told Saylor that she could not roll the account over as long as she remained a per diem employee at Bridgeway. Even assuming the truth of this testimony, as the Court must for purposes of this motion for summary judgment, Saylor has presented no evidence that Kennedy did not believe these statements to be true in the context in which she made them or that Kennedy sought to act in the interests of someone other than Saylor.

While Saylor also alleges that UHS "fail[ed] to provide crucial information," she has neither specified what information UHS failed to provide nor produced evidence that UHS knew that its failure to do so would be harmful to Saylor. The Court declines to speculate as to what information Saylor believes she should have been provided.

UHS is entitled to judgment as a matter of law that it did not breach its fiduciary duty of loyalty to Saylor.

## CONCLUSION

Saylor has produced no evidence that UHS knowingly misled her as to the terms of the Plan or otherwise dealt with her in a dishonest manner. The undisputed evidence shows that the delay in rolling Saylor's 401(k) over into her IRA was the result of Saylor's initial request for the rollover as a retirement distribution, which could not be processed while she remained employed at Bridgeway on a per diem basis, instead of an "age 59 ½" withdrawal. While this delay was unfortunate, UHS's determination that Saylor was not entitled to the loss in value of her account

between June 30 and August 23, 2004, was reasonable under the terms of the Plan.  UHS's motion for summary judgment is GRANTED.  Document # 40.

    IT IS SO ORDERED this 25th day of July, 2007.

                                                                                                         J. LEON HOLMES
                                                                                                        UNITED STATES DISTRICT JUDGE